**Ebenezer and Jean EBERHART, Plaintiffs,**

v.

**Buddy GETTYS, individually, and in his official capacity as the Mayor of the Town of Spencer, Eric R. Stillwell, individually and in his official capacity as an officer (Sergeant) of the Town of Spencer Police Department, Larry E. Smith, individually, and in his official capacity as Land Management Director for the Town of Spencer, and the Town of Spencer, Defendants.**

**No. 1:01CV00446.**

United States District Court, M.D. North Carolina.

July 11, 2002.

Norman B. Smith, Smith James Rowlett & Cohen, Greensboro, NC, B. Ervin Brown, II, Moore and Brown, Winston–Salem, NC, for Plaintiffs.

Harry Lee Davis, Jr., Davis & Hamrick, L.L.P., Winston–Salem, NC, for Defendants.

Carolyn Amanda Martin, Everett Gaskins Hancock & Stevens, Raleigh, NC, for Movant.

### MEMORANDUM OPINION

BEATY, District Judge.

This case comes before the Court on Defendants' Motion for Summary Judgment [Document # 21] as to Plaintiffs' suit brought pursuant to 42 U.S.C. § 1983 ("Section 1983"). Defendants have also presented the Court with a Motion to strike Plaintiffs' expert witness, Avery Barber [Document # 26], and a Supplemental Motion to prohibit Plaintiffs from offering witnesses or introducing documents [Document # 46]. For the reasons discussed herein, Defendants' Motion for Summary Judgment is DENIED in part and GRANTED in part. Defendants' Motion to Strike Plaintiffs' expert witness and their Supplemental Motion to prohibit Plaintiffs from offering witnesses or introducing documents are both DENIED.

## I. FACTUAL BACKGROUND

Plaintiffs Ebenezer and Jean Eberhart (together, "the Eberharts" or "Plaintiffs") allege that Defendants Buddy Gettys ("Gettys"), Eric Stillwell ("Stillwell"), Larry E. Smith ("Smith"), and the Town of Spencer ("Spencer" or "Town") (together, "Defendants") violated Plaintiffs' equal protection rights, as secured by the Fourteenth Amendment to the United States Constitution. The Eberharts are suing Gettys, Stillwell, and Smith in their individual and official capacities because at the time of the alleged equal protection violation, Gettys served as the mayor of Spencer, Stillwell served as a sergeant of the Spencer Police Department, and Smith served as Spencer's land management director. From 1999 until the summer of 2001, the Eberharts, both of whom are African–American, owned a boarding house, several rental properties, and a nightclub in Spencer, North Carolina. The Eberharts assert that the Town and its agents targeted their businesses because of their race, forcing the Eberharts to eventually close the nightclub and relinquish title to the boarding house.

The Eberharts allege that the Town's animosity towards them began in the summer of 1999, shortly after the Eberharts had renovated a dilapidated single family house in the Spencer historic district into a refurbished boarding house. The Eberharts had placed an advertisement in the local newspaper to attract renters to the newly-open boarding house, and someone anonymously mailed a copy of this advertisement to Gettys, the Town mayor, in early June of 1999. After receiving the advertisement, Gettys asserts that he called Mr. Eberhart and informed him that Spencer's zoning law probably prohibited the use of the Eberharts' property as a boarding house. Gettys admits in his deposition that this conclusion was

erroneous, for the Town's land management director at the time, Elvin Shelton ("Shelton"), later informed Gettys that a boarding house was indeed a permitted use for the Eberharts' property. (Gettys Dep. at 22, 27.) Gettys remembers that the conversation became somewhat heated and that Mr. Eberhart was upset. For his part, Mr. Eberhart does not recall this phone conversation and stated that his first communication with Gettys occurred on June 23, 1999.

On June 23, 1999, shortly after Gettys learned that the boarding house in historic Spencer was an authorized use, Gettys received a complaint from a neighbor of the boarding house. According to Gettys, the neighbor was upset about the boarding house and reported that the residents of the boarding house were often intoxicated and on at least one occasion had urinated on the property's front lawn. Gettys then called the Eberharts, leaving the following message on their answering machine:

> It's a damn rooming house in the middle of a single-family residence ... But you'd better get ready to get rid of it. That damn thing don't fit. We're taking it up at the next board meeting, and we're going to do something about it. You might as well get you a lawyer, because I'm fighting you.

(Gettys Dep. at 33.)

While both parties agree that Mr. Eberhart returned Gettys's phone call a few days later, Mr. Eberhart and Gettys recollect the phone conversation differently. Mr. Eberhart states that while he was trying to explain to Gettys that the Town had already approved the boarding house as a permitted use, Gettys became angry, stated "you damn nigger," and hung up on him. (Eberhart Dep. at 127.) In contrast, Gettys recalls that they engaged in a calm and rational conversation and denies that he made the racially derogatory statement. (Gettys Dep. at 43–44.) In fact, Gettys

asserts that, because all of his contact with Mr. Eberhart had been over the telephone, he did not even realize that Mr. Eberhart was black. After this phone call, the Eberharts did not encounter any further problems regarding the boarding house. However, beginning in the fall of 2000, the Eberharts claim that Spencer and its officials began to selectively and unlawfully enforce the Town's ordinances against the Eberharts' other business property, the nightclub.

A brief history regarding the nightclub is necessary at this time. When the Eberharts first began looking for property on which to operate a pool hall and nightclub in early 1998, Shelton suggested a property in Spencer on Long Ferry Road to the Eberharts. The Eberharts were initially concerned because the property was located near several single family homes on both sides of the railroad tracks, but Shelton allegedly explained to the Eberharts that the homes were residual non-conforming uses in an area that had since been rezoned. Shelton also reassured the Eberharts that operating the Long Ferry Road property as a nightclub was a permitted use in the new zone.

The Eberharts purchased the property in June of 1998, and Mr. Eberhart began operating the nightclub under several different names including "Eb's Game Room" and "Moonlight Dancing." In December of 1998, the Eberharts' nightclub received several warnings from the Spencer police department because the nightclub was violating Spencer's noise ordinances. Spencer's Code ordinances ("ordinances") include a general noise ordinance, codified in § 8–8, which states that "[s]ubject to the provisions of this chapter, the creation of any unreasonably loud, disturbing and unnecessary noise is prohibited. Noise of such character, intensity and duration as to be detrimental to the life or health of

any individual is prohibited." (Smith Aff., Ex. A at 5.) In addition, § 8–9(3) of the ordinances lists, as a specific activity that qualifies as a loud, disturbing, and unnecessary noise, the "playing of any radio, phonograph or other musical instrument in such manner or with such volume, particularly during the hours between 11:00 p.m. and 7:00 a.m., as to annoy or disturb the quiet, comfort or repose of any person in any dwelling, hotel or other type of residence." *Id.* at 6.

At 1:15 a.m. on December 25, 1998, the Spencer police department responded to the nightclub after a complaint of loud music. After a warning did not resolve the problem, the police returned to the party and requested that the party be shut down. (Smith Aff., Ex. F–1.) On December 26, 1998, the Spencer police again responded after complaints from an officer that the loud music from the party was audible at the nearby residences. A warning at 12:02 a.m. did not resolve the noise concern, and the police again informed the person in charge to shut the party down. (Smith Aff., Ex. F–2 & F–3.) With respect to these two incidents, the Eberharts assert that they had rented the nightclub out for a private party on the evening of December 25, 1998 and that they were not in attendance. (Eberhart Dep. at 55.)

In June of 1999, the Eberharts decided to close the nightclub for extensive remodeling. Mr. Eberhart undertook most of the remodeling himself and estimates the value of the renovations he made at approximately $250,000. In September of 2000, the Eberharts reopened the night-

club under the name "Ebenezer's." The nightclub operated as a pool hall from 5:00 p.m. to 8:00 p.m., Monday through Saturday. On Friday and Saturday, the nightclub operated as a dance club between 9:00 p.m. and 2:00 a.m.

The reopening of the nightclub led to increased complaints regarding the noise from the club by one identified neighbor, Wendy Moore Brown,[1] and several anonymous callers. The calls are recorded in the Spencer police log, which lists eight noise complaints regarding the nightclub between July of 2000 and December 10, 2000.[2] In response to one of these noise complaints on December 2, 2000, Stillwell went to Brown's home and was able to hear the music from the nightclub. Stillwell then went to the nightclub itself, where he noticed Mr. Eberhart on the nightclub premises. Stillwell then approached Mr. Eberhart, told him "I want you," and proceeded to issue Mr. Eberhart a warning citation for the violation of the noise ordinance. (Eberhart Dep. at 88, Heilig Dep. at 23.)

On December 4, 2000, Brown complained to Defendant Smith, the new land management director, about the noise coming from the nightclub. Smith then advised Brown of an opportunity to present her concerns to the Spencer Board of Aldermen ("Board") meeting on December 12, 2000. In the course of investigating Brown's concerns, Smith, who had received two other anonymous complaints about the noise emitting from the nightclub, reviewed the police records

---

**1.** Brown called "911" seven times between November 11 and December 30, 2000 regarding the noise from the nightclub. (Brown Dep. at 11.)

**2.** According to the police log, the Spencer police handled noise complaints regarding the nightclub on July 25, 2000 at 10:24 p.m., October 13, 2000 at 3:40 a.m., October 15,

2000 at 3:35 a.m., November 13, 2000, at 2:29 a.m., November 25, 2000 at 1:27 a.m., and December 2, 2000 at 2:43 a.m. and 3:50 a.m. (Smith Aff., Ex. F–4 to F10, Ex. M. at 16–17.) In addition, the police log records a December 10, 2000 complaint that shots were fired from the vicinity of the club. (Smith Aff., Ex. M at 17.)

and discovered eight recent noise-related complaints in the police log, including a December 10, 2000 report of shots being fired near the nightclub. Smith then drafted a letter to the Board members explaining that the club had been the subject of multiple complaints and recommending that the Board send the Eberharts a letter warning them that if they continued receiving multiple noise citations in a thirty-day period, their business license for the nightclub would be placed on probation, restricted, and potentially revoked.

At the December 12, 2000 Board meeting, Ms. Brown, who had requested to be placed on the meeting's agenda, was given an opportunity to express her complaints. Although Mr. Eberhart received a brief opportunity to answer Ms. Brown's allegations and the Board's concerns, Plaintiffs argue that they were unfairly treated at this meeting because the Town did not notify Mr. Eberhart of the meeting until the afternoon of December 12, 2000, and the Board did not allow Mr. Eberhart to fully respond to the complaints made about the nightclub. Gettys instead interrupted Mr. Eberhart before Mr. Eberhart had finished his comments,[3] and then stated, as recorded in the transcript of the Board meeting, "We don't need a situation where it breeds people come in and shoot around Spencer. Now if we ain't got the law behind us to stop that, we'll get somebody else to do it." (Smith Aff., Ex. I at 3–5.) At the conclusion of the December 12, 2000 meeting, the Council agreed to send the Eberharts Smith's letter warning the Eberharts that their business license could be in jeopardy if there were subsequent noise violations.

Shortly after this meeting, the Spencer police department responded to another complaint regarding the nightclub at 2:13

a.m. on December 16, 2000. In addition to issuing another noise ordinance warning citation to the manager, Stillwell charged Mr. Eberhart with a criminal violation of the Section 8–9(3) noise ordinance based on the December 16, 2000 incident. Plaintiffs assert that no other person in Spencer besides Mr. Eberhart has been charged with a criminal violation of the noise ordinance. Plaintiffs also assert that Stillwell and other police officers came to their house late at night and very early in the morning approximately 25 times in the three weeks between December 16, 2000 and January 4, 2001. (Eberhart Dep. at 193.) Although Stillwell states that during this time he was attempting to serve the criminal summons on Mr. Eberhart, Stillwell denies that he ever visited the house late at night. As a partial explanation for why it took several weeks to serve Mr. Eberhart, Mr. Eberhart admits that he was hiding from Stillwell during this time. Stillwell eventually served the summons on Mr. Eberhart on January 4, 2001 at 3:40 p.m. after Mr. Eberhart, on the advice of his attorney, contacted the Spencer police department to arrange for the service of the summons. Mr. Eberhart was tried for the criminal noise violation charge and was found not guilty.

After receiving the criminal noise citation, Mr. Eberhart installed a noise meter on the premises of the nightclub to measure the amount of noise coming from the club. He then ordered his nightclub managers to monitor the noise meter to ensure that the noise level heard outside the club was no louder than the noise level of regular conversation. Even so, the nightclub received another noise warning on January 22, 2001. Additionally, on March 24, 2001, the Spencer police responded to a noise complaint by a Sue Davis, an employee at

---

**3.** There is a factual dispute between the parties as to whether Gettys, when regaining the floor from Mr. Eberhart, told Mr. Eberhart to "be quiet" or to "shut up".

a nearby nursing home, at approximately 9:00 p.m. Mr. Eberhart alleges that, although he was present at the nightclub on this date to attend to some business matters, the nightclub was in fact closed. However, the police report states that the police officers were able to hear music from the nightclub even while the officers were on a different street. The police officers then presented Mr. Eberhart with a summons for a criminal noise violation dated March 24, 2001 at 8:57 p.m., even though Mr. Eberhart argued that the club was closed and that the noise ordinance did not go into effect until 11:00 p.m. Ultimately, the criminal case against Mr. Eberhart was subsequently dismissed.

In addition to the issues regarding the noise ordinance, Mr. Eberhart asserts several other examples of harassing behavior at the hands of Spencer officials.[4] For example, Mr. Eberhart asserts that he was harassed at an incident occurring at a local grocery store. The incident began when several friends of Mr. Eberhart were not allowed to buy beer at a grocery store. Although Mr. Eberhart was not initially in the store when his friends attempted to purchase the beer, he joined his friends after the store's refusal and while Stillwell, who happened to be shopping in the store, was speaking to his two companions. While all three men were present, Stillwell allegedly ordered them to leave the premises or else he would "lock your asses up." (Eberhart Dep. at 106.) Stillwell also refused to let Mr. Eberhart drive from the store, forcing the men to leave their vehi-cle in the store parking lot. Stillwell recounts a different version of this incident, in that he did not recall using offensive language in the conversation and that he prevented them from driving home because he smelled a strong odor of alcohol on all three.

As another example of harassing behavior by the Town, Mr. Eberhart also asserts that between June of 2000 and June of 2001, he received over eight notifications from Spencer informing him that he had violated various Town ordinances regarding yard upkeep and trash disposal at two of his rental properties. Mr. Eberhart had not received similar notifications before 2000. Defendants assert that the increase in notifications are attributed to a policy decision to more strictly enforce the Town's yard upkeep ordinances, a decision that was made when Defendant Smith became Spencer's land management director and code enforcement officer in March of 2000. (Smith Aff. ¶ 2.) In fact, over 627 notices of violation were served to various properties in Spencer between March of 2000 and June of 2001. *Id.* ¶ 8. Furthermore, Smith asserts in his affidavit that Brown did not receive the most notices of violation and that the Ordinances were enforced without regard to race. As proof, Smith avers that between March of 2000 and June of 2001, his office sent nineteen notices of violation to a white property owner of three properties and seventeen notices of violation to another white property owner of four properties. *Id.* ¶ 10.

---

4. As one of these incidents, Plaintiffs assert that the nightclub manager, Mr. Heilig, was stopped by the Spencer police, who allegedly asserted that Heilig was driving while impaired. As Mr. Heilig is not a party to this suit, Plaintiffs cannot rely on his experience with the police without demonstrating that the incident somehow caused them injury. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561–62, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (stating that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish"). As Plaintiffs have not satisfactorily alleged that they or their business was injured by the traffic stop of Mr. Heilig, Plaintiffs do not have standing to assert that this incident violated their constitutional rights.

On May 25, 2001, Mr. Eberhart closed the nightclub because of a sharp drop in profits, which the Eberharts attributed to a decrease in attendance caused by the frequent police presence at the club. Shortly thereafter, the Eberharts were no longer able to pay the mortgage on the boarding house and deeded the boarding house property back to the lender in order to avoid foreclosure. In addition to this financial loss, the Eberharts also state they have endured mental suffering because of the incident. The Eberharts therefore bring this lawsuit asserting a Section 1983 violation. As the basis for their Section 1983 violation, Plaintiffs assert that Defendants have violated their equal protection rights by selectively enforcing the Town's ordinances and policies against them and request relief in the form of compensatory damages, punitive damages, and an injunction.

## II. DISCUSSION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only grant a motion for summary judgment for a moving party when "the entire record shows a right to judgment with such clarity as to leave no room for controversy" and the record clearly demonstrates that the non-moving party " 'cannot prevail under any

circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the "benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Nevertheless, the non-moving party cannot rely solely on unsupported assertions to demonstrate that a genuine issue of material fact exists. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 212. Judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Id.* at 251, 106 S.Ct. at 2511, 91 L.Ed.2d at 213 (quoting *Schuylkill & Dauphin Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1872)).

### B. Defendants' Summary Judgment Motion

#### 1. Plaintiffs' Section 1983 Claim based on an Equal Protection Violation

In support of their Summary Judgment Motion, Defendants assert that Plaintiffs cannot establish the elements of their Section 1983 claim, which Plaintiffs base on an equal protection violation. Pursuant to Section 1983,

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. A plaintiff can utilize Section 1983 to gain a private right of action for a violation of the plaintiff's constitutional rights when "unequal administration of a state statute" demonstrates "intentional or purposeful discrimination." *LeClair v. Saunders,* 627 F.2d 606, 609 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *see also Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *Jetstream Aero Servs., Inc. v. New Hanover County,* 884 F.2d 1388, 1989 WL 100644, *1 (4th Cir.1989) (unpublished opinion); *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Bd. of Selectmen of Town of Randolph,* 932 F.2d 89, 92 (1st Cir.1991). In order to prove such an equal protection violation based on the selective enforcement of facially valid laws or ordinances, Plaintiffs must demonstrate (1) that they were treated differently from others who are similarly situated, and (2) that such treatment was intentional or purposeful, based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 609–10; *Rubinovitz v. Rogato,* 60 F.3d 906, 910 (1st Cir.1995) (applying the *LeClair* standard); *Houck & Sons, Inc. v. Transylvania County,* 852

F.Supp. 442, 452 (W.D.N.C.1993) (utilizing the *LeClair* test).

Defendants assert that Plaintiffs cannot demonstrate either element of their claim of an equal protection violation. Disagreeing with Defendants' contention, Plaintiffs assert that they have satisfied both elements of their claim. As proof that Plaintiffs were treated differently from other businesses, Plaintiffs present the multiple noise citations and police visits they received regarding the noise of the club. Although Defendants assert that all of the visits were in response to citizen complaints, the police records list many of the callers as anonymous, making it difficult to verify their identity.[5] Also, Plaintiffs have presented proof that no one but Mr. Eberhart has ever been charged with a criminal noise violation. Indeed, Mr. Eberhart has received two criminal noise violations, apparently the only two criminal noise violations ever issued by Spencer. With respect to the second criminal noise citation, it was issued on a date that Mr. Eberhart asserts the club was closed and for a noise violation at 8:57 p.m., even though the violation relies on an ordinance that focuses on disruptive noise occurring between the hours of 11:00 p.m. and 7:00 a.m. Mr. Eberhart was ultimately found not guilty as to both criminal charges. Furthermore, the Eberharts assert that they began to receive multiple citations with respect to the upkeep of several of their additional rental properties.

Notwithstanding Plaintiffs' proof, Defendants assert that the Eberharts have

---

5. While the Court recognizes that Defendants have testified that many complainants prefer to be anonymous, the Court's concern about the lack of validation of these complaints is heightened given that Plaintiffs have presented proof that one of the complaints was wrongly attributed. More specifically, Smith asserted that he received a complaint in early December from a woman who stated that she

lived on the other side of the railroad tracks from the nightclub and had been bothered by the noise from the nightclub. However, Plaintiffs have presented the Court with the affidavit of Mary Ruth Roberson, who avers that she is the only person who lives across the tracks from the nightclub and that she had never complained to the Town regarding the noise. (Roberson Aff. ¶ 6.)

failed to demonstrate that they were treated differently from other similarly situated businesses. As Defendants' records have demonstrated, multiple other residents and businesses have received warnings from the police, and several other residents have received noise warning citations. However, no one else has received a criminal noise citation, even though other properties have received multiple noise complaints. In order to distinguish these other instances of multiple noise complaints, Defendants state that the circumstances of these noise complaints often involved loud vehicles, or different tenants in an apartment building, and therefore did not present the same situation as the nightclub. Furthermore, to the extent that Plaintiffs did receive multiple noise warning citations and, in fact, two criminal noise citations, Defendants assert that Plaintiffs cannot be compared to any other similarly situated business because no other businesses generated this much noise, and that the frequent complaints regarding the nightclub gave them a reasonable justification for the additional scrutiny of Defendants' location.

■ As the legal support for their argument that their conduct did not constitute selective enforcement, Defendants rely substantially on a case from the Western District of North Carolina, *Cottom v. Town of Seven Devils*, 2001 WL 1019410 (W.D.N.C. June 13, 2001), in which the court concluded that the owners of a ski resort had not demonstrated that the town had violated their equal protection rights. *Cottom*, 2001 WL 1019410 (W.D.N.C. June 13, 2001), *aff'd*, 2002 WL 369961, 30 Fed. Appx. 230 (4th Cir.2002); *see also Canady v. City of Wilson*, 1998 U.S. Dist. LEXIS 21041 (E.D.N.C.1998) (finding no selective enforcement based on race when the city had demonstrated that the Native American plaintiff was not treated differently than other similarly situated business owners and the plaintiff's only other evidence

of a racial bias was a hearing officer's comment that "It's going to be my personal pleasure to force you out of business"). The acts constituting selective enforcement alleged by the *Cottom* plaintiffs were similar to those alleged by Plaintiffs—increased police surveillance and police visits to the ski resort. *Id.* However, the Court notes that the *Cottom* court reached its decision because the defendants' proof that the plaintiffs were treated fairly was "wholly uncontradicted by *evidence* proffered by Plaintiffs." *Id.* (emphasis in original). Unlike *Cottom*, in this instance, Plaintiffs have presented proof, discussed above, that could allow a reasonable jury to find in Plaintiffs' favor as to the selective enforcement element of their claim. In particular, the Court notes that Defendants' assertion that the treatment of the nightclub was justified by the continued noise problems is weakened by the facts surrounding the second criminal noise violation. According to Plaintiffs, Mr. Eberhart received the second criminal charge of a noise violation that occurred when the club was closed and two hours before 11:00 p.m., the time specified in the noise ordinance. Furthermore, the nightclub at that point in time had been the subject of only one other violation in the previous three months. For these reasons, the Court concludes that Plaintiffs' proof presents a genuine issue of fact with respect to whether the Eberharts were treated differently than other similarly situated businesses in the Town that may have been the recipient of warnings related to excessive noise.

■ However, Plaintiffs must also meet the second element of their claim, which is that Defendants' actions were motivated by an illegal animus. In this instance, Plaintiffs allege that Defendants violated their equal protection rights through the purposeful selective enforcement of the

Town's ordinances because the Eberharts were African–American. The Court finds that Plaintiffs have presented the following proof to support this claim of racial animus. Mr. Eberhart, in his deposition, recollects a phone conversation in June of 1999 with Gettys regarding the boarding house, in which Gettys allegedly said a racial epithet. Plaintiffs also present Gettys's admission that he left a message for the Eberharts in June of 1999, also pertaining to the boarding house, in which Gettys stated, "You might as well get you a lawyer, because I'm fighting you." (Gettys Dep. at 33.) Furthermore, Plaintiffs present the transcript of the Board meeting on December 12, 2000, where Gettys stated "We don't need a situation where it breeds people come in and shoot around Spencer. Now if we ain't got the law behind us to stop that, we'll get somebody else to do it." (Smith Dep., Ex. I.) The Court finds this statement by the mayor probative, in that it could be reasonably inferred that the Board intended to target the Plaintiffs, regardless of whether such a stance was legally permissible.

To counter this proof, Defendants present the statements of all Defendants that they were not targeting Plaintiffs based on unconstitutional criteria. Defendants also emphasize that the Eberharts have not presented evidence of any other racial comments by Defendants beyond the one alleged comment made by Gettys in June of 1999. Furthermore, Defendants challenge Plaintiffs' proof that Gettys uttered the racial epithet during the phone conversation that he had with Mr. Eberhart.

With respect to the June, 1999 phone conversation, the Court recognizes that Gettys and Mr. Eberhart recount different versions of this phone conversation. However, when determining whether a genuine issue of material fact exists for trial, the Court must credit the non-moving party's version of the facts. *Bailey,* 67 F.3d at 56.

Similarly, to the extent Defendants proffer proof that multiple persons had not heard Gettys make racially derogatory comments, such proof might support Gettys's credibility. Again, such a credibility determination is the province of a jury. *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 435–36 (4th Cir.2001).

As an alternative argument against Plaintiffs' use of Gettys's alleged racial statement as part of their proof to demonstrate animus, Defendants argue that, even if Mr. Eberhart's testimony is credited, Gettys's comment was at most an isolated incident that occurred more than a year and a half before Plaintiffs' problems with the nightclub. Defendants thus maintain that the incident is too far removed to support an inference that racial bias influenced the Town's treatment of the Eberharts. Although Defendants present case law to support their argument, they draw primarily on employment discrimination cases involving "hostile work environment" harassment claims in which the courts suggest that more than one racial slur is necessary to establish that the harassment is "severe or pervasive enough to alter the conditions of his employment and create an abusive atmosphere." *Brown v. Housing Auth. of Calvert County,* 150 F.Supp.2d 856, 863 (D.Md.2001) (granting summary judgment for the defendant as to his employment discrimination claim), *aff'd,* 2002 WL 191577, *1, 26 Fed.Appx. 339 (4th Cir. 2002). While the cases cited by Defendants state the appropriate standard for a hostile work environment claim, the elements of a hostile work environment claim differ significantly from the elements of an equal protection claim of selective enforcement. In the cases that Defendants rely on, the plaintiffs present evidence of racially derogatory statements not merely to show a discriminatory intent but as the

plaintiffs' proof that the environment was hostile and abusive. *Id.* at 864 (finding no hostile work environment when the plaintiff's coworkers made less than ten discriminatory comments). In contrast, a plaintiff asserting a selective enforcement claim who presents evidence of racially-biased statements is using the statements to demonstrate that the selective enforcement was based on discriminatory means. Although a single racially derogatory comment, by itself, cannot establish racial animus, the Court emphasizes that Plaintiffs do not rely merely on Gettys's statement, but also on the other circumstantial proof of intent and selective enforcement, as summarized above. *See, e.g., Helton v. Dornan,* 1999 WL 58641, *8 (N.D.Ill.1999) (holding that the plaintiff could not establish an equal protection violation when "his claim is based solely on his allegation that the officers used racial epithets upon arresting him"). The Court also finds it significant that, in this case, the alleged racially biased statement was made not merely by a Town employee, but by the Town's mayor, who as a high-level official could be seen to have considerable power over the Town's enforcement process. Gettys was still serving in this position a year and a half after he allegedly made the comment, when the issues involving the nightclub and Plaintiffs' other rental properties came to the forefront.

Given Gettys's service as mayor throughout the time period in question, as well as the additional proof of animus and selective enforcement that Plaintiffs present as summarized above, the Court can-not conclude, as Defendants urge, that Gettys's alleged racial statement as a matter of law is too attenuated from the controversy to be at all probative of racial animus. In light of the proof on both sides, it is clear to the Court that the decision as to whether Defendants acted with racial animus is a factual question that is inappropriate for the Court to make on summary judgment. Accordingly, after reviewing the proof presented by the parties, the Court finds that a genuine issue of material fact exists as to whether Defendants have selectively enforced the Town's ordinances against Plaintiffs because of their race. The Court therefore finds that Plaintiffs have presented sufficient issues of fact to allow their Section 1983 claim to proceed to withstand Defendants' Motion for Summary Judgment.

2. Defendants' Affirmative Defenses of Immunity

a. The Individual Defendants' Defense of Qualified Immunity

██ Notwithstanding the Court's determination that Plaintiffs have satisfied the elements of their selective enforcement claim for purposes of summary judgment, summary judgment in Defendants' favor may still be warranted based on Defendants' affirmative defenses of qualified immunity and municipal immunity.[6] The Court shall first consider whether any or all of the individual Defendants—Stillwell, Smith, and Gettys—meet the requirements for qualified immunity. This defense "shield[s] [governmental agents] from lia-

---

6. The Court notes that Defendants' Brief Supporting their Motion for Summary Judgment does not address the individual Defendants' rights to qualified immunity, although Defendants did assert the municipal immunity of Spencer in their Brief and Plaintiffs in their Response argue that neither qualified immunity nor municipal immunity protected Defendants from suit. However, Defendants do assert qualified immunity as an affirmative defense in their Answer [Document # 5]. Given that the purpose of qualified immunity is to protect an official not only from liability, but also from the lawsuit itself, the Court finds it appropriate to consider Defendants' qualified immunity defense at this time. *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738, 73 L.Ed.2d 396.

bility for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier,* 516 U.S. 299, 305–06, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996) (brackets in original) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In order to determine if an individual defendant has qualified immunity, the Court must, as a "threshold question," determine whether, when "taken in the light most favorable to the party asserting the injury, ... the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If the Court answers this question in the affirmative, it then must consider the second inquiry regarding "whether the right was clearly established" at the time the alleged constitutional violation occurred. *Id.*

■ As to the initial inquiry, the Court has already detailed the facts presented by Plaintiffs and has concluded that these facts, if proven or credited at trial, demonstrate that Defendants' equal protection rights were violated. However, qualified immunity prevents a defendant from being sued in his individual capacity unless the plaintiff's proof supports a determination that the individual defendant himself violated the plaintiff's rights. *See, e.g., Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 647 (10th Cir.1988) (noting that when a plaintiff claims a defendant acts unconstitutionally because of racial animus, "the governmental actor's intent, motive or purpose is the critical element"); *Wade v. Hegner,* 804 F.2d 67, 69 (7th Cir.1986) ("[T]he district court properly considered evidence of [the individual defendant's] racial animus and his intent to discriminate against [the plaintiffs] because they are black when deciding whether a constitutional violation oc-

curred."). Given the individual nature of this determination, the Court finds it necessary to consider Plaintiffs' proof regarding the actions of Gettys, Smith, and Stillwell separately.

■ As to Defendant Gettys, the Court notes that its summary of Plaintiffs' proof above included conduct that Plaintiffs assert demonstrates that Gettys violated their equal protection rights. Importantly, Plaintiffs have presented as part of their forecast of evidence proof that Gettys acted with racial animus, as demonstrated by his conduct and statements at the December 12, 2000 Board meeting and the alleged racially derogatory statement in June of 1999. This proof, combined with Plaintiffs' other evidence of acts of selective enforcement, establishes a genuine issue of material fact regarding whether Gettys violated Plaintiffs' constitutional rights.

However, this finding alone is not enough to abrogate Gettys's qualified immunity. The Court now must reach the second prong of the qualified immunity analysis and consider whether Plaintiffs' equal protection rights were well-established at the time of the alleged violation in 2000. Because the equal protection violation of selective enforcement was first established in the Supreme Court's 1944 *Snowden v. Hughes* decision and has been applied and confirmed by numerous courts in the subsequent years, the Court finds that it was in fact well-established by 2000 that selective enforcement of a town's ordinances based on racial animus violated the Constitution. For these reasons, the Court finds that, at this time, a genuine issue of material fact prevents Defendant Gettys from avoiding suit in his individual capacity based on the defense of qualified immunity.

■ Notwithstanding the Court's above finding with respect to Gettys, the

Court reaches a different conclusion with respect to Defendants Stillwell and Smith. Plaintiffs' proof, while sufficient to demonstrate racial animus on behalf of the Town and of Gettys, does not create a genuine issue of material fact with respect to the motive of these two Defendants. Plaintiffs have presented no proof of any racial animus on behalf of Smith and, as such proof is necessary to defeat a defendant's qualified immunity, Smith is therefore protected from individual liability in this suit. As to Stillwell, Plaintiffs' proof of motive stems from the following events: Stillwell's attempts to serve Mr. Eberhart with the criminal summons, his refusal to let Mr. Eberhart drive immediately following the grocery store incident, his issuance of a criminal noise violation and a civil warning citation to Mr. Eberhart, and his statement to Mr. Eberhart when Stillwell issued the civil warning citation that "I want you." Even granting Plaintiffs the benefit of all favorable inferences, and notwithstanding the fact that Stillwell's behavior can be used to demonstrate a general plan on behalf of the Town to selectively enforce ordinances based upon race, this proof cannot demonstrate that Stillwell himself harbored the requisite racial animus for individual liability. Accordingly, the Court finds that Stillwell also is entitled to qualified immunity from Plaintiffs' claims against him in his individual capacity.

b. Defendant Spencer's Defense of Municipal Immunity

■■■■ In addition to the individual Defendants' affirmative defense of qualified immunity, Defendant Spencer also relies on an immunity defense by asserting that, notwithstanding the Court's decision that Plaintiffs have satisfied the elements of their Section 1983 claim, Spencer is shielded from suit by municipal immunity. A municipality cannot be held liable under Section 1983 unless it is the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, [that] inflicts the injury." *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). An extension of this general principle is that "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to Section 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality opinion)).[7]

■■■■ Relying on this municipal immunity, Defendant Spencer asserts that there is no evidence that Spencer itself had a discriminatory policy. As support on this point, Defendants proffer Smith's affidavit statement that he was not directed by Gettys or anyone else to enforce the ordinances in a discriminatory manner. (Smith Aff. ¶ 24.) Although Smith's affidavit is probative on this issue, it does not definitively resolve the question in Spencer's favor, for the Court finds that Plaintiffs have forecasted sufficient evidence to establish a question of fact on this matter. More specifically, Plaintiffs' proof regarding their interactions with the Town, including Gettys's comments at the December 12, 2000 Board meeting that "if we ain't got the law behind us to stop that, we'll get someone else to do it," and the

---

7. It is a question of state law as to whether a particular official is considered a policymaker whose decisions impose liability upon a municipality. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924, 99 L.Ed.2d 107. Defendants have not countered Plaintiffs' categorization of Gettys and Smith as policymakers for the Town of Spencer.

Board's decision to send the letter written by Smith to the Eberharts warning them that their business license might be revoked, can be seen as a challenge to Smith's testimony. The Court therefore finds that a question of fact exists as to whether the alleged governmental acts occurred pursuant to either a municipal policy or decisions made by a final policymaker and that summary judgment in favor of the Town on the basis of municipal immunity is not proper at this time. Accordingly, Defendants' Summary Judgment Motion is DENIED except as to Plaintiffs' claims against Defendants Stillwell and Smith in their individual capacities. Defendants' Summary Judgment Motion is GRANTED as to Plaintiffs' claims against Defendants Stillwell and Smith in their individual capacities.

## III. DISCUSSION REGARDING DEFENDANTS' MOTION TO STRIKE

In addition to their Motion for Summary Judgment, Defendants have also filed a Motion to Strike Plaintiffs' expert witness, Avery Barber, who is a North Carolina licensed professional counselor. Defendants assert that Plaintiffs should be prevented from utilizing Barber as an expert witness for two reasons. First, Defendants assert that Plaintiffs failed to disclose that Barber was a treating counselor of Mr. Eberhart by the deadlines established pursuant to the parties' Rule 26(f) of the Federal Rules of Civil Procedure ("Rules") report. In greater detail, Defendants assert that Barber was not listed as one of Mr. Eberhart's treating counselors in Plaintiffs' interrogatory answers, which were returned to Defendants on July 26, 2001. Plaintiffs also omitted Barber from

the expert witnesses list that Plaintiffs were required to submit to Defendants by October 1, 2001.

■ In their defense, Plaintiffs have represented that Mr. Eberhart did not begin seeing Barber until August 13, 2001, several weeks after Plaintiffs filed their interrogatory answers.[8] Although Barber was therefore not listed in the interrogatory answers, Mr. Eberhart did identify Barber as his counselor during his September 10, 2001 deposition. As to the expert witness submission, Plaintiffs' counsel admits that he did not provide Defendants with the required information by the October 1, 2001 deadline, but asserts that he had been unable to gather the necessary information for this submission until December 14, 2001, the date upon which he presented the information to Defendants. Moreover, Plaintiffs' counsel also asserts that he had informally notified Defendants' counsel in early fall of 2001 that he intended to call Barber as a witness. While the Court does not condone Plaintiffs' tardiness in procuring the necessary information, the Court finds that Defendants have not been significantly prejudiced by the delay and the Court will thus elect in its discretion to not impose a sanction based on this shortcoming alone.

As a second justification for discovery sanctions, Defendants maintain that it is unfair to allow Barber to testify as to Mr. Eberhart's mental health when they have not been presented with Mr. Eberhart's full medical records. At the time Defendants filed their Motion, February 11, 2002, they had not yet received Mr. Eberhart's records from Barber or from the alcohol treatment center at which Mr. Eberhart received treatment. Defendants have received release forms signed by Mr.

---

**8.** Rule 26(e) requires a party to supplement its disclosures or interrogatory answers if the party learns that in some material respect the information disclosed is "incomplete or incor-

rect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed.R.Civ.P. 26(e).

Eberhart authorizing the release of his medical records to Defendants, but Defendants assert that, at the time they had filed the motion, the treatment facility had not yet responded.

 Under Rule 34, a party may request an opportunity to inspect and copy designated documents that are within the scope of discovery and "which are in the possession, custody or control of the party upon whom the request is served." Fed. R.Civ.P. 34. In the context of medical records, a release form for relevant medical records signed by the patient often provides the requesting party with the same access that the patient himself may have to the records. *Smith v. Logansport Community Sch. Corp.*, 139 F.R.D. 637, 649 (N.D.Ind.1991). Because Defendants have been presented with a signed release form that would allow Defendants to procure the needed and relevant information, Defendants' Motion to Strike Barber's testimony is DENIED at this time. The Court recognizes, however, that Plaintiffs' delay has prevented Defendants from the opportunity to take Barber's deposition during the discovery period. To remedy this delay, the Court grants Defendants permission to conduct a deposition of Barber before trial, if Defendants so desire. If, at trial, Defendants can demonstrate that Plaintiffs failed to provide a reasonable opportunity for them to depose Barber despite Defendants' request for the deposition, Defendants may at that time again move that the Court strike all testimony from Barber.

## IV. DISCUSSION REGARDING DEFENDANTS' SUPPLEMENTAL MOTION TO PROHIBIT PLAINTIFFS FROM OFFERING WITNESSES OR INTRODUCING DOCUMENTS

The Court now turns to Defendants' Supplemental Motion to prohibit Plaintiffs from offering witnesses or introducing documents [Document # 46]. Defendants assert that Plaintiffs failed to provide the disclosures required under Rule 26(a)(3) by the established deadline. Defendants further assert that at the settlement conference held on June 12, 2002, Plaintiffs represented that they would serve the disclosures on or before June 17, 2002. Despite this assurance from Plaintiffs, Defendants contend that they had not received the disclosures as of June 18, 2002, and assert that this delay has prejudiced their preparation for trial. To remedy the delay, Defendants now ask the Court to prevent Plaintiffs from offering any witnesses or introducing any exhibits at trial. In their Response to Defendants' Supplemental Motion [Document # 54], Plaintiffs confirmed that they had intended to present Defendants with the Rule 26(a)(3) disclosures as of June 17, 2002, but that a power outage prevented them from completing the disclosures by that date. However, Plaintiffs represent that the Rule 26(a)(3) disclosures were delivered to Defendants' counsel at 10:00 a.m. on June 18, 2002.

 As the title of Defendants' Supplemental Motion indicates, Defendants had earlier filed a similar Motion, a Motion to prohibit Plaintiffs from offering witnesses or introducing documents [Document # 43], on June 12, 2002. The Court had ruled on this June 12, 2002 Motion at the settlement conference that same day. At that time, the Court recognized that, although Rule 26(a)(3) clearly required submission of the disclosures at least thirty days before trial, there was some confusion as to the trial date in this instance. This confusion arose in part because, notwithstanding the instant case's placement on the Court's master calendar beginning on July 8, 2002, the Court had on January 7, 2002 issued an Order [Document # 20] granting Plaintiffs' Motion for an adjust-

ment of the trial schedule [Document # 19] so that the trial would not begin until July 23, 2002.[9] The parties therefore disagreed as to whether July 8, 2002 or July 23, 2002 served as the trial date. The Court concluded that, given the circumstances and the language of the Rule in question, the deadline for the parties to satisfy Rule 26(a)(3)'s requirements would be thirty days before the adjusted trial date of July 23, 2002. As Plaintiffs now represent that the Rule 26(a)(3) disclosures were delivered to Defendants' counsel on June 18, 2002, which is more than thirty days before the adjusted trial date of July 23, 2002, the Court shall not find a Rule 26(a)(3) violation at this time. Accordingly, Defendants' Supplemental Motion to prohibit Plaintiffs from offering witnesses or introducing documents is DENIED.

## V. CONCLUSION

After reviewing Plaintiffs' proof that Spencer officials selectively enforced the Town's Ordinances against Plaintiffs on account of their race, the Court has decided that Defendants have failed to demonstrate that they are entitled to judgment as a matter of law as to Plaintiffs' Section 1983 equal protection claim. Accordingly, Defendants' Motion for Summary Judgment is DENIED except as to Plaintiffs' claims against Defendants Stillwell and Smith in their individual capacities. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' claims against Defendants Stillwell and Smith in their individual capacities. Defendants' Motion to Strike Plaintiffs' expert witness, Avery Barber, is also DENIED. In connection with Defendants' Motion to Strike, Defendants are granted leave to conduct a deposition of Avery Barber prior to trial. Defendants' remaining Motion, their Sup-

plemental Motion to prohibit Plaintiffs from offering witnesses or introducing documents, is also DENIED.

## ORDER

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [Document # 21] is DENIED except as to Plaintiffs' claims against Defendants Smith and Stillwell in their individual capacities. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' claims against Defendants Smith and Stillwell in their individual capacities.

IT IS FURTHER ORDERED that Defendants' Motion to Strike Plaintiffs' expert witness, Avery Barber [Document # 26], is DENIED. Defendants are granted leave to conduct a deposition of Avery Barber prior to trial.

IT IS FURTHER ORDERED that Defendants' Supplemental Motion to prohibit Plaintiffs from offering witnesses or introducing documents [Document # 46] is also DENIED.

---

9. Following the settlement conference, the Court issued an Order [Document # 42] granting Plaintiffs' Motion to revise the sched- uling of the trial [Document # 40] and ordering that the trial shall not begin prior to August 12, 2002.